IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 16-cv-61175-UU

WILSON ALMENDAREZ,

    Plaintiff,

v.

CITY OF HOLLYWOOD, et al.

    Defendants.
_____/

**PLAINTIFF'S RESPONSE TO CITY OF HOLLYWOOD AND CHIEF OF POLICE SANCHEZ'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

WILSON ALMENDAREZ ("ALMENDAREZ"), pursuant to S.D. Fla. L.R. 56.1, responds to Defendants' CITY OF HOLLYWOOD ("CITY") and CHIEF OF POLICE TOMAS SANCHEZ's (CHIEF SANCHEZ) Statement of the Facts, [DE 102], as follows:

**I. CITY AND CHIEF SANCHEZ's STATEMENT OF MATERIAL FACTS**

The CITY and CHIEF SANCHEZ's Motion for Summary Judgment relied[1] upon unsworn police reports, MICHAEL MCBRIDE's ("MCBRIDE") discovery responses, Hollywood Police Department standard operating procedures, and the Telemundo footage wherein there are numerous discrepancies as described below. Further, the police reports are unsworn and the Internal Affairs Investigative Reports are plagued with inadmissible hearsay within hearsay. *Jessup v. Miami–Dade Cnty.*, 697 F.Supp.2d 1312, 1322 (S.D. Fla. 2010). Accordingly, the efficacy of such is suspect at best and raises the specter that material facts exist that counter those laid out in their Statement of the Facts thereby precluding summary judgment.

---

[1] Despite the numerous depositions and hearing conducted thus far, the CITY and CHIEF SANCHEZ fail to cite to any of the sworn testimony presented.

A.      **January 23, 2015 Incident**

1.      It **undisputed** that a "Wanted/PC Exists" flyer was posted for the arrest of Francisco Quintana ("Quintana") on January 22, 2015, advising that Quintana had snatched a gold chain from a victim and fled. While it is **undisputed** that a "sudden snatching" without a firearm or other deadly weapon is a felony of the third degree under Fla. Stat. § 812.131, it is important to note that this information was not included on the flyer. [D.E. 92-6].

2.      It is **undisputed** that MCBRIDE was requested by Detective Brasso ("Brasso") to respond to 1734 McKinley Street, Hollywood, Florida, as back up.

3.      It is **undisputed** that Brasso advised MCBRIDE that the alleged suspect fled into Apartment No. 4 ("Apt. 4"). However, it is **disputed** that David Jiminez ("Jiminez"), the alleged suspect, fled the courtyard. Ex. A at 6. (Plaintiff's Interrogatory Responses).

4.      It is **disputed** that ALMENDAREZ did not tell officers that he resided in Apt. 4. ALMENDAREZ was questioned by law enforcement officers, turned over his identification, and advised that he lived in Apt. 4. *Id.*; Ex. B at 11:19-23 (Evidentiary Hearing on Telemundo Motion to Quash). It is **undisputed** that ALMENDAREZ did not tell officers that he had a dog inside of his apartment, however ALMENDAREZ believed that law enforcement officers were investigating someone in Apartment No. 10 and was never advised that Apt. 4 was of any interest to the officers even after inquiry. *Id.* at 13:20-24; Ex. A at 3.

5.      It is **undisputed** that Officer Hughes ("Hughes"), and K9 Arco were positioned several feet away from Apt. 4. and MCBRIDE had his service weapon drawn acting as lethal back-up.

6.      It is **disputed** that "[o]fficers repeatedly ordered the suspect … to put the dog away." It is **undisputed** that Sergeant Barnick ("Barnick") commanded Jiminez to "secure the dog." [DE 54-

5 at 3]; Ex. C at 24:13-20; 25:14-23 (Deposition of Retired Sergeant James Barnick); Ex. D at 12: 3-9; 13:1-4; 31:11-17 (Deposition of BSO Deputy Cesar Morales).

7. It is **disputed** that Missy was "barking aggressively." Barnick testified that law enforcement officers knew a dog was inside Apt. 4 because "it was barking relatively loud." Ex. C at 23:12-15. Hughes testified in response to whether he knew a dog was inside Apt. 4 that "at one point in time, I did hear barking from inside the apartment." Ex. E at 17:10-13 (Deposition of Ofc. Thomas Hughes). Neither of these officers described the barking as aggressive whatsoever. *Id.* In fact, Broward Sherriff Officer Morales ("Morales") testified that he could not even hear Missy barking. Ex. D at 12:10-12. Furthermore, ALMENDAREZ testified before this Honorable Court that Missy "was friendly with little kids, with adults, with everybody. She wasn't a mean dog…she wasn't an aggressive dog." Ex. B at 8:12-15; 9:19-22. It is **disputed** that the "torn tin foil at bottom of door that covered jalousie windows" was a result of Missy scratching. The crime scene technician determined that the "lower jalousie appears consistent with being struck with a 'BB'." [DE 92-5 at 44]; [D.E. 54-6 at 2]. The record is devoid of any determination by the technician that the tin foil was torn as a result of a scratching dog. *Id.*

8. This statement of the facts is an embellishment and belied by witness deposition testimony and the Telemundo footage of Missy's demise. It is **disputed** that "**[w]ithout warning**, the occupant **flung** the door open and **released** the large pit bull into the courtyard." It is the testimony of the officers on scene that the door to Apt. 4 "opened" in compliance with law enforcement officer's commands, and that the dog "exited" or "ran out" of the apartment. [DE 92-7 at 5-6]; [DE 54-5 at 3]; Barnick Depo at 28:6-12; Hughes Depo at 31:23-25; 32:1-2. There is absolutely no evidence that Missy was "released." *Id.* It is **undisputed** that Missy ran directly towards Hughes and K9 Arco, however in order to exit the courtyard Missy would have had to

run towards any officer, including Hughes and MCBRIDE, due to the way the officers were stacked and the confined space of the courtyard. Ex. C at 29:6-21; Ex. D at 40:5-18. It is **undisputed** that Hughes was able to kick the dog hard in the stomach, however it is **disputed** that the kick "did not phase the pit bull." Hughes testified that the use of his foot was effective in "deterring the animal" from attacking him and his police canine. Ex. E at 24:9-13. Hughes also testified that by kicking Missy he was able to "deflect the dog away." Ex. B at 23:14-15. Barnick testified that the force used by Hughes "diverted the dog away from him." Ex. C at 29:3-5. Morales testified that upon being kicked, Missy was deterred away from Hughes. Ex. D at 13:15-23. Furthermore, CHIEF SANCHEZ agreed that after being kicked by the Hughes "[i]t looks like the dog turns to head toward a different direction." Ex. F at 46:9-19 (Deposition of Police Chief Sanchez). Expert James W. Crosby, testified that "[t]he simple, single kick by Hughes caused Missy to avoid any further contact with Hughes." [DE 100-1 at 11:1]. There is unequivocal evidence that the less than lethal kick swayed Missy. *Supra*. It is **disputed** that Missy "charged at [MCBRIDE's] legs." Morales, who "saw the whole thing," testified that after Hughes kicked Missy, she "went towards the back and pretty much just went around and went directly at Officer McBride." Ex. D at 13:19-25. It is **undisputed** that MCBRIDE was armed and shot Missy until she expired. It is **disputed** that MCBRIDE "began to retreat backwards as the dog charged him." CHIEF SANCHEZ agreed during his deposition that MCBRIDE can be seen on the Telemundo footage, [DE 94], turning his body away from Hughes and following Missy as she ran past him, discharging his weapon without any apparent reason to do so. Ex. F at 46:20-24; 48:1-2; 49:6-8. It is **disputed** that "MCBRIDE feared for his own safety and that of the other officers in the area due to the substantial risk of great bodily harm." Material discrepancies exist between MCBRIDE's report and the Telemundo footage of the shooting on January 23, 2015. Crosby

testified that upon his observation of the shooting and Missy's behavior, it is his opinion that Missy was on a path to pass between Officer Hughes and MCBRIDE; the dog did not "visibly turn to engage with Officer McBride," [DE 98-1 at 94:2-22]; and Missy's body posture was not consistent with a dog that was "bent on attack. It was consistent with a dog that was attempting to flee." *Id.* at 67:5-9. CHIEF SANCHEZ also agreed that there was no second attack either, as alleged in the Internal Affairs Investigative Report. Ex. F at 66:10-19.

9. It is **undisputed** that Hollywood Police Department ("HPD") conducted an on-site investigation of the incident after the shooting.

10. It is **undisputed** that an 18-page Internal Affairs Investigative Report concluded that MCBRIDE acted in conformity with the City's use of force standard operating procedures. The accuracy and efficacy of the Report is **disputed**. For example, ALMENDAREZ has sworn under oath that Mr. Jiminez did not have a tattoo on his neck on January 23, 2015. Ex. A at 6. This sworn testimony flies in the face of the unsworn Internal Affairs Unit Investigative Report that claims "Jiminez is a slender Latin male born in [] with a tattoo on his neck as well." [DE 54-1 at 18]. CHIEF SANCHEZ testified the Telemundo footage clearly shows there was no second attack as alleged in the Internal Affairs Investigative Report. Ex. F at 66:10-19. The Internal Affairs Unit Report is plagued with inadmissible hearsay within hearsay. *Jessup*, 697 F.Supp.2d at 1322 (summaries of interviews contained in internal affairs investigative reports are "double hearsay that cannot be admitted at trial or considered on summary judgment").

B.  **City's Use of Force Policy**

11. – 17. These statements of the facts regarding SOP 200 are **undisputed.**

18. It is **undisputed** that Plaintiff does not contend that the express, *de jure*, polices are unconstitutional. Rather, it is the *de facto* policy and custom wherein officers engage in deadly

force against animals as a first resort, without fear of disciplinary action that is unconstitutional. [DE 54]. Furthermore, while the express policies are not unconstitutional, they are deficient. [D.E. 98-1 at 117:15-25; 118-119:22] (Expert James Crosby testimony regarding deficiencies, such as the requirement that Broward County Animal Control only be called to assist injured animals and the lack of a provision with conditions on when it is appropriate or recommended to use less -lethal force in conflicts with animals.)

C.     **Prior Alleged Dog Shootings**[2]

21.    It is **undisputed** that on May 3, 2012, HPD Detective Graham shot and killed a dog while in the scope of his employment as a law enforcement officer. There is insufficient evidence to determine the veracity of the remaining facts from the unsworn and incorrectly dated police reports, [DE 92-3 at 103-105], accordingly those facts are **disputed**. It is **undisputed** that HPD Internal Affairs Unit did not investigate the dog shooting involving Detective Graham. [DE 111-1 at 4:38]; [DE 111-2 at 3:38];[DE 92-3 at 4:32]; [DE 92-4 at 3:32].

22.    It is **undisputed** that on July 17, 2012, HPD Officer Loveras shot and killed a dog while in the scope of his employment as a law enforcement officer. There is insufficient evidence to determine the veracity of the remaining facts from the unsworn police reports, *Id.* at 107-113, accordingly those facts are **disputed**. It is **undisputed** that HPD Internal Affairs Unit did not investigate the dog shooting involving Officer Loveras. [DE 92-3 at 4:39]; [DE 92-4 at 3:39]; [DE 111-1 at 6:46]; [DE 111-2 at 4:46].

23.    It is **undisputed** that on September 26, 2012, HPD Officer Perez shot and killed a dog while in the scope of his employment as a law enforcement officer. There is insufficient evidence to determine the veracity of the remaining facts from the unsworn police reports, *Id.* at 115-122,

---

[2] CITY and CHIEF SANCHEZ's statement of the facts do not include numbers 19 and 20, accordingly, ALMENDAREZ responds to the numbers as listed pursuant to S.D. Fla. L.R. 56.1.

accordingly those facts are **disputed**. It is **undisputed** that HPD Internal Affairs Unit did not investigate the dog shooting involving Officer Perez. [DE 92-3 at 5:46]; [DE 92-4 at 3:46]; [DE 111-1 at 6:54]; [DE 111-2 at 5:54].

24. It is **undisputed** that on January 22, 2014, HPD Officer MCBRIDE shot and killed a dog while in the scope of his employment as a law enforcement officer. There is insufficient evidence to determine the veracity of the remaining facts from the unsworn police reports and unsigned Internal Affairs Unit Investigative Report, *Id.* at 124-152, accordingly those facts are **disputed**. MCBRIDE's sworn interrogatory answers dated November 18, 2016, contain conflicting accounts of the events of January 22, 2014, specifically answer number three (3), which in response to a request to "[d]escribe what behaviors of the dog caused you to feel threatened on January 22, 2014 at 2534 Wiley Street," [DE 92-1], MCBRIDE responded in part, "[t]he dog displayed aggression and **charged at several officers on the fenced perimeter of the house**…" [DE 92-2]. Each and every report submitted in response to the January 22, 2014 shooting investigation, including MCBRIDE's, stated that the dogs were heard barking inside the residence when they approached and there is not a single report of any officer observing the dog charging on the fenced perimeter. [DE 92-3 at 124-152].

25. It is **undisputed** that on February 12, 2014, HPD Officer Lang shot and killed a dog while in the scope of his employment as a law enforcement officer. There is insufficient evidence to determine the veracity of the remaining facts from the unsworn police reports, *Id.* at 154-183, accordingly those facts are **disputed**. Additionally, the reports do not state that "[n]o complaint was made about the shooting to the City," nor did the CITY and CHIEF SANCHEZ offer any other evidence to support that contention, accordingly that fact is **disputed**.

26. It is **undisputed** that on May 14, 2014, HPD Sergeant Graham, Officer Burrows, and Officer McClintok shot and killed a dog while in the scope of their employment as law enforcement officers. There is insufficient evidence to determine the veracity of the remaining facts from the unsworn police reports and hearsay ridden Internal Affairs Unit Investigative Report, *Id.* at 185-206, accordingly those facts are **disputed**. Additionally, the purported fact that "[n]o complaint regarding the shooting of the dog was every [sic] filed with the City," is unsupported by any evidence, accordingly that fact is **disputed**.

27. It is **undisputed** that on September 21, 2014, HPD Officer Rivera shot and killed a dog while in the scope of his employment as a law enforcement officer. There is insufficient evidence to determine the veracity of the remaining facts from the unsworn police reports and hearsay ridden Internal Affairs Unit Investigative Report, *Id.* at 208-216, accordingly those facts are **disputed**. Additionally, the reports do not state that "[n]o formal complaint was made to the City regarding the dog shooting," nor did the CITY and CHIEF SANCHEZ offer any other evidence to support that contention, accordingly that fact is **disputed** and controverted by discovery produced by the CITY and CHIEF SANCHEZ referencing a lawsuit that was filed against the City in response to the dog shooting on September 21, 2014. Ex. G (Correspondence between Channel 7 News and HPD).

28. It is **undisputed** that on September 24, 2014, HPD Detective Charles shot and killed a dog while in the scope of his employment as a law enforcement officer. There is insufficient evidence to determine the veracity of the remaining facts from the unsworn police reports and hearsay ridden Internal Affairs Unit Investigative Report, accordingly those facts are **disputed**.

# PLAINTIFF'S STATEMENT OF MATERIAL FACTS[3]

A. **January 23, 2015**

1. HPD was fully aware of the Telemundo footage, yet failed to acquire said footage for the investigation into MCBRIDE's use of force. [DE 54-1 at 18]; Ex. H (Shooting Review Board Memorandum); Ex. F at 45:20-24; 48:7-25.

B. **City's Use of Force and Training**

2. HPD Standard Operating Procedure # 201, governing the use of Special Impact Weapons & Chemical Agents, instructs officers to use Aerosol Chemical Agents as a less-lethal force when "an animal poses an immediate threat to a Member or another person." [DE 105-1].

3. HPD does not offer and/or require specialized training on interacting with animals other than police canines, identifying animal abuse, and using catch poles in stray and animal abuse cases. Ex. C at 9:21-25 – 12:1-7; Ex. I at 51:18-21 (Deposition of Lt. Thea Basler); Ex. F at 12:23-25; 13:1-4.

4. HPD does not offer and/or require training on identifying aggression in animals. Ex. I at 19:25 – 21:1-5.

5. HPD does not offer and/or require training on dealing with a dog that is contained and then becomes at large. Ex. C at 27:11-16.

6. HPD does not offer and/or require training on the use of less than lethal force specifically against an animals. Ex. I at 18:21-25; 19:1-4; Ex. F at 19:21-25; 20:1-13.

7. In 2014, HPD Lieutenant Basler circulated an article entitled "Can Police Stop Killing Dogs?" not for training purposes in order to mitigate dog shootings, but to provide HPD law

---

[3] ALMENDAREZ incorporates his statement of material facts filed in response to MCBRIDE's Statement of Facts. [DE 120]

enforcement officers of an example of why there were more in depth investigation and documentation on dog shootings to deter lawsuits. Ex. I at 31-33:1-18; Exhibit 4.

8.  It is a generally accepted in law enforcement that a domestic animal that is barricaded behind an obstacle is less of a threat, and a dog that is behind a closed door does not present a threat to law enforcement officers. Ex. I at 20:21-25; 21:1-5, 25; 22:1-4, 18-22; Ex. D at 27:9-19.

9.  It is a generally accepted in law enforcement that a law enforcement officer verify whether a targeted suspect was still wanted before attempting an apprehension. Ex. D at 45:12-23; Ex. F at 61:20-25; 62-63:1-8; Ex. C at 20:9-17; 33:1-12.

C.  **Prior Dog Shootings**

10. Between 2006 and 2014 there were at least thirty-five (35) reported dog shootings by HPD law enforcement officers. Ex. F at Exhibit 3.

11. MCBRIDE has shot and killed more domestic dogs than any other HPD law enforcement officer. *Id.* MCBRIDE has informed his superiors of his distrust in less-than-lethal means. Ex. J.

12. CHIEF SANCHEZ understands that MCBRIDE is exposed to situations where he would encounter domestic pets more than other officers, yet provided no training on the handling of them. He instead resorts to K9 training as sufficient. Ex. F at 33:25 – 35:1-14. K9 training focuses on the tactical use of highly trained and specialized canines in criminal apprehensions or narcotics detection, not domestic canine behavior and aggression at issue in this case. [110-1] (Training SOP # 112), [110-2] (Police Canine SOP # 227); [110-3 at 6-9]. *See also* Ex. C at 34.

13. HPD did not discipline any of the law enforcement officers involved in the thirty-five (35) reported dog shootings. Ex. F at 59:13-15.

14. HPD has not employed a third party to investigate any of the thirty-five (35) reported dog shootings. *Id*. at 59:20-22.

Dated: May 12, 2017

BY:/s/ Marcy LaHart
Marcy I. LaHart, Esq.
Florida Bar No. 0967009
Marcy@floridaanimallawyer.com
MARCY I. LAHART, P.A.
4804 SW 45th Street
Gainesville, Florida 32608
Telephone (352) 224-5699
Attorney for Plaintiff

Respectfully Submitted,

BY: /s/ Heidi M. Mehaffey
Robert N. Hartsell, Esq.
Florida Bar No. 636207
Sarah M. Hayter, Esq.
Florida Bar No. 83823
Heidi M. Mehaffey, Esq.
Florida Bar No. 118806
Robert@Hartsell-Law.com
 Sarah@Hartsell-Law.com
Heidi@Hartsell-Law.com
ROBERT N. HARTSELL, P.A.
Federal Tower Building
1600 S. Federal Highway, Suite 921
Pompano Beach, Florida 33062
Telephone (954) 778-1052
Attorneys for Plaintiff

**CERTIFICIATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via CM/ECF electronic mail service to this 12th day of May, 2017 to the Clerk of the Court. I also certify that the foregoing document is being served this day on all counsel of record listed in the enclosed Service List.

BY: /s/ Heidi M. Mehaffey
Heidi M. Mehaffey, Esq.
Florida Bar No. 118806

**COUNSEL OF RECORD SERVICE LIST**

Daniel L. Abbott, Esq.
Florida Bar No. 767115
Trevor C. Jones, Esq.
Florida Bar No. 92793
WEISS SEROTA HELFMAN
COLE & BIERMAN, P.L.
*Attorneys for Defendants City of Hollywood*
*and Chief of Police Tomas Sanchez*

200 E. Broward Boulevard, St. 1900
Fort Lauderdale FL 33301
Telephone: 954-763-4242
Facsimile: 954-764-7770
dabbott@wsh-law.com (primary email)
tjones@wsh-law.com (primary email)
pgrotto@wsh-law.com (secondary email)


Bruce W. Jolly, Esq.
Florida Bar. No. 203637
Gregory J. Jolly, Esq.
Florida Bar No. 118287
PURDY, JOLLY, GIUFFREDA
& BARRANCO, P.A.
*Attorneys for Officer McBride*
2455 East Sunrise Boulevard, St. 1216
Fort Lauderdale, Florida 33304
Telephone: 954-462-3200
Telecopier: 954-462-3861
bruce@purdylaw.com
greg@purdylaw.com
susie@purdylaw.com